

U.S. DISTRICT COURT – N.D. OF N.Y.

**FILED**

**Mar 17 - 2023**

John M. Domurad, Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**
**AT SYRACUSE**

| | | |
|---|---|---|
| JOHN KOTRUCH, | : | Case No. 5:22-cv-01343 |
| | : | |
| Plaintiff, | : | Judge Frederick J. Scullin, Jr. |
| | : | Magistrate Judge Miroslav Lovric |
| v. | : | |
| | : | |
| THOR MOTOR COACH, INC., MEYER'S | : | **AMENDED COMPLAINT AND JURY** |
| RV CENTERS, LLC, FREIGHTLINER | : | **DEMAND** |
| CUSTOM CHASSIS CORPORATION, and | : | |
| UNITED SERVICE PROTECTION CORP. | : | |
| | | |
| Defendants. | | |

## PRELIMINARY STATEMENT

1.  This case involves claims asserted under the New York and/or Indiana Commercial Code, the Magnuson-Moss Warranty Act, the New York Motor Vehicle Lemon Law, the New York consumer protection laws, including General Business Law Art. 22-A, Consumer Protection from Deceptive Acts and Practices, NY CLS Gen Bus 349-350 et seq., and fraud and misrepresentation.

2.  Jurisdiction exists with this court because a federal claim exists in which there is more than $50,000 in controversy under 15 USC 2301 et seq, invoking 28 USC 1331, and/or the amount in controversy is more than $75,000 and is between citizens of different states, invoking 28 USC 1332.

3.  The vehicle which is the subject of this dispute was manufactured, assembled, and warranted by Thor Motor Coach, Inc. ("Thor") in its final form in Indiana. Thor sold the vehicle to Meyer's RV Centers, LLC d/b/a Camping World RV Sales ("Meyer's RV"). Each of the Defendants who performed any repair or service work upon the subject vehicle gave an implied warranty to Mr. Kotruch that the work had been performed in a good, workmanlike manner. Mr. Kotruch complained to one or more Defendants about the defects he discovered

and/or experienced in the subject vehicle and ineffective repair attempts were made upon the subject vehicle by one or more of each Defendants' authorized representative repair facilities in New York, New Hampshire, Montana, Missouri, Ohio and Indiana, at Camping World Syracuse, Camping World London, Camping World St. Louis, Freightliner New Hampshire, Cummins Northeast, Freightliner Londonberry, the Thor factory, Camping World Chichester, and one or more mobile repair technicians from Yellowstone Mobile RV Services in the Livingston, Montana area.

4.    In each instance where Thor warranty coverage seemed applicable to Mr. Kotruch, Thor controlled the decision to approve or deny warranty coverage. In each instance where Freightliner warranty coverage seemed applicable to Mr. Kotruch, Freightliner controlled the decision to approve or deny warranty coverage.

5.    The place where the relationship of the parties arose is New York because the obligations of each Defendant were given to and received by Mr. Kotruch in New York and Defendants directly interacted with Mr. Kotruch in New York and in New Hampshire and Indiana. Thor distributed advertising and solicited sales of the RVs which it manufactured, in whole or in part, including Mr. Kotruch's RV, in New York, New Hampshire and Indiana.

6.    Mr. Kotruch initially filed suit in this matter on December 14, 2022. *See* Complaint. All Defendants have provided "written consent" for the filing of this Amended Complaint. *See* Fed. R. Civ. Pro. 15(a)(2)("a party may amend its pleading only with the opposing party's written consent or the court's leave.")

## **IDENTIFICATION OF PARTIES**

7.    John Kotruch is a natural person domiciled and residing in New Hampshire and is a consumer and buyer within the meaning of all applicable laws in this case.

8.     Thor was, at all times relevant hereto, a Delaware for profit corporation doing business in New York and elsewhere. Thor has its principal place of business and domicile in and is a resident and citizen of Indiana. Thor was, at all times relevant hereto, engaged in the business of selling and servicing recreational motor vehicles through its authorized dealerships and agents, including Meyer's RV. Thor has consented to jurisdiction and venue of Mr. Kotruch's dispute in the courts of New York.

9.     Meyer's RV is a limited liability company and does business as "Camping World RV Sales" in New York at 7030 Interstate Island Road, Syracuse, New York. Meyer's RV was a supplier, merchant, and an authorized representative and agent of Thor in New York for the sale and service of Thor products in New York, and was authorized by Thor to act for it as its authorized agent and representative in New York in all respects related to the sale and service of the subject vehicle involved in this case.

10.     Freightliner Customer Chassis Corporation ("Freightliner") was, at all times relevant hereto, a corporation doing business in New York, Oregon, and elsewhere, and is the manufacturer and warrantor of the subject motor vehicle chassis that was used in the construction of the subject vehicle that Mr. Kotruch acquired from Meyer's RV in New York. Freightliner has its principal place of business and domicile in and is a citizen and resident of Oregon. Freightliner was, at all times relevant hereto, engaged in the business of servicing recreational motor vehicle chassis through its authorized dealerships and agents, which it maintains in New Hampshire, New York, Indiana and elsewhere.

11.     United Service Protection Corp. ("United Service") is a corporation with its principal place of business in Florida and a mailing address of P.O. Box 20899, St. Petersburg, Florida, 33742. United Service contracted with Mr. Kotruch to provide repair services for the subject vehicle ("the Extended Service Contract"). A true and accurate copy of the Extended Service Contract

is before this Court as Exhibit B (ECF No. 12-8) to the Declaration of Kurt Schroeder (ECF No. 12-6).

12.     The vehicle at issue in this case was manufactured as a complete vehicle in Indiana by Thor and intended for distribution to New York and/or any other state where Thor has an authorized retail sales dealership location, and was warranted in whole or part by Thor.

13.     Mr. Kotruch acquired the subject RV from Meyer's RV in Syracuse, New York.

14.     Mr. Kotruch presented the subject RV for repairs under the Thor warranty to Meyer's RV.

15.     Mr. Kotruch also presented the subject RV for repairs under the Thor warranty to Camping World RV Sales Columbus, in London, Ohio. At all times relevant hereto, Camping World RV Sales Columbus was a supplier, merchant and an authorized representative and agent of Thor in Ohio for the servicing of Thor products in Ohio. At all times relevant hereto, Camping World RV Sales Columbus was authorized by Thor to act for it as its authorized agent and representative in Ohio in all respects related to the attempted performance of warranty repair and service work upon the subject new Thor vehicle, and hundreds of other Thor products.

16.     Mr. Kotruch also presented the subject RV for repairs under the Thor warranty to Camping World RV Sales St. Louis, in Wentzville, Missouri. At all times relevant hereto, Camping World RV Sales St. Louis was a supplier, merchant and an authorized representative and agent of Thor in Missouri for the servicing of Thor products in Missouri. At all times relevant hereto, Camping World RV Sales St. Louis was authorized by Thor to act for it as its authorized agent and representative in Missouri in all respects related to the attempted performance of warranty repair and service work upon the subject new Thor vehicle, and hundreds of other Thor products.

17.     Mr. Kotruch presented the subject RV for repairs under the Thor warranty to the Thor Factory, in Elkhart, Indiana. At all times relevant hereto, the Thor factory was a supplier,

merchant and an authorized representative and agent of Thor in Indiana for the servicing of Thor products in Indiana. At all times relevant hereto, the Thor factory was authorized by Thor to act for it as its authorized agent and representative in Indiana in all respects related to the attempted performance of warranty repair and service work upon the subject new Thor vehicle, and hundreds of other Thor products.

18.    Mr. Kotruch presented the subject RV for repairs under the Thor warranty to Camping World RV Sales New Hampshire, in Chichester, New Hampshire. At all times relevant hereto, Camping World RV Sales New Hampshire was a supplier, merchant and an authorized representative and agent of Thor in New Hampshire for the servicing of Thor products in New Hampshire. At all times relevant hereto, Camping World RV Sales New Hampshire was authorized by Thor to act for it as its authorized agent and representative in New Hampshire in all respects related to the attempted performance of warranty repair and service work upon the subject new Thor vehicle, and hundreds of other Thor products.

19.    After about ten failed repair attempts at the many defects in the RV, a warranty repair appointment was scheduled with Thor to occur at Thor's factory repair facilities for November 2, 2020 and Mr. Kotruch timely delivered the subject RV to Thor with a list of 36 defective items that were to be repaired by Thor under the Thor warranty at the Thor factory in Indiana. Additional defects were observed at the Thor factory by Thor employees and were to be repaired during this effort, which lasted to December 28, 2020, when Thor advised Mr. Kotruch that it had "completed" the needed repairs of about 63 defect items which took 187 days, during which time the RV was out of service.

20.    On February 8, 2020 Mr. Kotruch picked up what Thor said was the "repaired" subject RV and before he could even leave the factory he found the windshield wiper fluid was frozen. On February 9, after leaving the factory Mr. Kotruch found the turn signal cameras did not

work and the navigation system did not work right so Mr. Kotruch returned to the factory on February 10 for repairs, by which time all three video cameras had failed. With an RV that is about 45 feet long, video cameras are critically important to see behind and beside the RV while traveling on highways. On February 11 Thor said the RV was repaired. On February 12 Mr. Kotruch picked up the RV to go home, only to have a mirror break and a loud banging noise started from the front right of the RV. Even more defects and failures occurred after that, some while Mr. Kotruch had the RV and some while Camping World in New Hampshire had it.

21. With more and more defects arising and continuing, Mr. Kotruch presented the subject RV for additional repairs under the Thor warranty to Yellowstone Mobile RV Service in the Livingston, Montana area.

22. In spite of repair attempts, defects, malfunctions, and failures only continued and On June 18, 2021, Mr. Kotruch sent a letter to Defendants revoking acceptance of the RV.

23. During the course of Mr. Kotruch's ownership of the subject RV, defects have been worked on once or twice or three times under warranty over the course of about 14 repair attempts and the RV was out of service due to its defects and repair attempts for about 200 days, most of which occurred in the first year after retail sale to Mr. Kotruch. At least 8 defects in the RV existed when it was delivered to the Meyer's RV, including heating system failure and a toilet that would not work. More defects existed when it was delivered to Mr. Kotruch. More defects existed when it was delivered to multiple warranty repair facilities for repair attempts under warranty. More defects existed when it was delivered to Thor for it to do repairs under its warranty at its own factory repair facilities. More defects existed when Thor gave the RV back to Mr. Kotruch and claimed it was all fixed. And more defects have arisen since then.

24. On information and belief, when Thor distributed this RV it knew (1) that it would not bet unusual for this new RV to require repair work for defects when it arrived new at the selling dealership, (2) that it would not be unusual for this new RV to require repair work for defects while it was sitting on the retail dealer's lot before it would be sold retail, (3) that it would not be unusual for this new RV to require repair work for defects during the first year after it was sold retail, and (4) that it would not be unusual for this new RV to require repair work for defects after the first year of ownership by whoever bought it. But Thor never disclosed its knowledge of those things to Mr. Kotruch.

25. Purchased for personal, family use in traveling both before and after his retirement, the RV cost Mr. Kotruch just under $283,000 and although Mr. Kotruch made a substantial down payment on the RV when he bought it, he has had to make monthly payments of $1,778.28 on the RV even when it was in the shop and when it was still not working right. Mr. Kotruch did not buy this RV so that he could meet all the service department people he has complained to, nor to talk with all the Thor people he has complaint to. Mr. Kotruch thought he was buying what Thor claimed was a luxury RV, one that was built right, but what he got was a Thor lemon that Thor's authorized repair facilities either could not or would not get completely repaired.

## COUNT 1: BREACH OF WARRANTY

26. The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein. This claim is for breach of warranty, express and/or implied, by Defendants Thor and/or Meyer's RV and/or Freightliner, jointly and/or severally. Each of the said Defendants gave an express and/or implied warranty to Mr. Kotruch related to the purchase of the subject vehicle by Mr. Kotruch, Defects and/or non-conformities existed and/or arose in the subject vehicle that were the fault of and contrary to the warranty from one or more of

the Defendants and each such Defendant was given a reasonable opportunity and a reasonable amount of time to cure the defect(s) that they were obligated to repair and each of them failed to do so within a reasonable number of attempts and/or within a reasonable amount of time and thereby breached their contract and/or contract of warranty with Mr. Kotruch.

27.    On December 28, 2019, Meyer's RV sold to Mr. Kotruch a brand new, fully-outfitted, luxury motor home, more particularly described as a 2019 Thor "Tuscany 45MX," VIN No. 4UZFCHFE4JCKM0537, for a purchase price of $271,685.00. Mr. Kotruch paid $41,000 down toward the price of the subject RV. The remaining balance of the purchase price was $263,545 and was paid with a promissory note with U.S. Bank which required 240 monthly payments for principal and interest beginning February 11, 2020 and which would total $426,787.20 in payments made at its conclusion.

28.    The subject motor home was manufactured, assembled, and placed into the stream of commerce by Thor. In the construction Thor acquired and used a chassis made by Freightliner and which Freightliner warranted to Mr. Kotruch.

29.    Immediately after taking delivery of the subject motor home, Mr. Kotruch discovered a number of severe manufacturing flaws, defects, and other non-conformities in the RV which were the fault of Thor and/or Freightliner for creation and which Meyer's RV and/or one or more of the Meyer's RV failed to repair, the most serious of which included the following:

(1).    There was severe water leakage in both the driver's cabin and the living quarters of the motor home, resulting not only in discomfort for the occupants but also staining of the interior walls, ceiling, and fixtures.  Not only did the leakage cause physical water damage, and but it also created the potential for mold, causing a health hazard;

(2).    Alternator, Air conditioning system, coolant line leaks, and/or "smart wheel" failure defects;

(3).    The toilet did not work;

(4).   The heating system was not working properly, and it only sporadically delivered heat to the living quarters of the vehicle. The heater also had a very annoying propensity to turn itself off spontaneously in the middle of the night;

(5).   The vehicle turning cameras and back-up cameras that are used to help navigate the mobile home while it is being driven by the operator did not function; and

(6).   The interior paneling was pulling away from the wall, and other defects.

28.   Mr. Kotruch promptly brought these problems, and many others, to the attention of one or more of the Defendants and requested the defects be repaired under the applicable warranties. One or more of the Meyer's RV and/or Freightliner repair facilities took possession of the RV and went through the motions of addressing Mr. Kotruch's complaints under warranty, but they kept the vehicle at its dealerships and service facilities for lengthy periods of time and never did fix all the defects. The first time was nearly three months, from December 28, 2019 to March 17, 2020, while purporting to fix the numerous problems. Thus, Mr. Kotruch was wholly deprived of the use of his ostensibly brand new, luxury, $271,685.00 RV for the first three months of his ownership of it while one of the Meyer's RV was supposedly performing the repairs.

29.   Near the end of the first three-month period out of service, that Camping World RV Sales New Hampshire then falsely notified Mr. Kotruch that all of his complaints had been addressed, that all of the repairs had been performed, and that all of the flaws and defects of which he had complained had been corrected, and it advised him that he was free to pick up his vehicle. He did so, on or about March 17, 2020.

30.   However, upon retaking possession of the vehicle and driving it home to New Hampshire, Mr. Kotruch discovered that most of the defects of which he had complained were not, in fact, fixed. There was still leakage in the unit, and the heating system was still not working properly. When Mr. Kotruch dropped off the motor home to a local, authorized service

9

facility in New Hampshire for a routine initial inspection and routine maintenance in late April, 2020, it was discovered that the hoses to the forward heater had been installed improperly at the Thor factory. In addition, there were a number of other, less serious defects which had not been corrected, as well as the unresolved problem with the leakage.

31.     In the months that followed Mr. Kotruch's pick-up of the vehicle from Meyers' RV on March 17, 2020, numerous new, additional defects in the RV surfaced, and the most serious of the problems which had previously been the subjects of Mr. Kotruch's complaints remained uncured.  Literally dozens of new problems arose, in varying degrees of severity, including problems with the electrical system, the transmission, and the air conditioner; and the vehicle was brought to another local authorized service facility, where it remained for five weeks, from June 9, 2020 to July 16, 2020, in another unsuccessful effort to correct said problems with warranty repair attempts.

32.     By virtue of the foregoing facts and circumstances, the Defendants have breached their express warranties, their implied warranties of merchantability, and their implied warranties of fitness to Mr. Kotruch.

33.     Mr. Kotruch promptly notified the Defendants of their breaches of warranty and gave the latter more than ample time and repeated opportunities to cure them.  As part of his efforts to obtain relief from the Defendants, Mr. Kotruch personally drove the subject motor home from his residence in New Hampshire to Thor's main service facility in Indiana, where it remained for another three months, from November 2, 2020 to February 9, 2021, so that Thor could perform the repair attempts itself.  In a letter to the Defendants dated February 1, 2021, Mr. Kotruch pointed out that in the first sixty weeks since he had purchased the motor home, it had been in one repair facility or another for fifty of those sixty weeks and that, despite this, it had never been rendered fully operational.

34.    However, despite being given repeated opportunities to cure their breaches of warranty and generous amounts of time in which to do so, the Defendants each failed to cure them.  In each instance, after Mr. Kotruch retrieved the subject motor home from a Defendant's repair facilities he found that the most serious of the defective conditions remained uncorrected and new problems and defects surfaced.  As of the time that he revoked his acceptance of the product on April 20, 2021, some of the defects which he had originally complained of and brought to the attention of Meyer's RV on December 29, 2019 were still uncorrected, more than a year later, including the leakage and the defective heating system.  In one particularly notorious episode, he drove the motor home to Montana for a camping trip in early April, 2021, after the product had already spent three months at Thor's service facility in Indiana being subjected to repair attempts, and the heating system failed during the Montana trip, where the overnight temperatures at that location are typically 20° F at that time of year.

35.    On April 20, 2021, Mr. Kotruch revoked his acceptance of the subject RV in accordance with the provisions of section 2-608 of the Uniform Commercial Code, due to the Defendants' longstanding, persistent failure to cure their respective breaches of warranty.  Mr. Kotruch subsequently confirmed such revocation via an e-mail message dated May 9, 2021 and in a letter dated May 27, 2021 over his signature, as well as in a confirmatory letter dated September 27, 2021 over the signature of his counsel.

36.    As a result of the Defendants' individual, joint and/or several breaches of warranty, Mr. Kotruch has suffered damages in the amount of approximately $341,080, itemized as follows:

(1).    The Defendants have failed and refused, and continue to fail and refuse, to refund the purchase price of $271,685, to which Mr. Kotruch is entitled under section 2-711 of the Uniform Commercial Code upon revocation of acceptance pursuant to section 2-608.  Mr. Kotruch paid a down payment of $41,000 upon purchase of the subject motor home and has paid more than $38,000 in installment loan payments to U.S. Bank, and the current, outstanding balance on his loan is approximately $235,000.

(2).    Mr. Kotruch has incurred approximately $14,000 in New Hampshire city taxes and motor vehicle registration fees for the years 2020 and 2021.

(3).    Mr. Kotruch has paid approximately $4,000 in motor vehicle insurance premiums in order to insure the vehicle during that period.

(4).    Mr. Kotruch incurred $2,900 in out-of-pocket expenses in the form of fuel, tolls, meals, and lodging during two trips to Indiana to drop off and to subsequently pick up the subject motor home at Thor's service and repair facility at that location.

(5).    He effectively lost an additional $5,600 in income in making those two trips, for he was forced to use three paid vacation days from work for each trip. Each of the two trips effectively cost him $2,800 in lost salary.

(6).    Mr. Kotruch incurred a total of $1,580 in charges for regular, annual maintenance at two local, authorized service facilities, including fuel expense for driving the subject motor home to their sites.

(7).    The Defendants are liable for all such costs and expenses because of their breaches of warranty.

## COUNT 2: FRAUD AND MISREPRESENTATION

37.    The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

38.    At the time that they sold him the subject mobile motor home, one or more of the Meyer's RV represented to Mr. Kotruch that the subject motor home was a brand new product and that it was being sold to him as such. If Mr. Kotruch had known the truth, he would not have bought the RV.

39.    That representation was false.  It later came to Mr. Kotruch's attention that prior to its sale to him the subject motor home had been used as a "demonstrator" model and it had close to 1,000 miles on it, a fact which was unknown to him until the sales transaction had already been completed.  The mileage from Elkhart, Indiana to Syracuse, New York is only about half that distance.  Thus, even if the subject motor home were physically driven from Elkhart to Syracuse by a Thor or Camping World employee, as opposed to being transported by a train

or tractor-trailer, the vehicle should have had no more than around 500 miles on it. The additional 500 miles or so is unexplained, unless the Defendants were driving it from show to show or from dealership to dealership in order to display it to prospective buyers and/or to allow the latter to take it on test drives.

40.     Further, copies of service records which Mr. Kotruch eventually obtained, relating to service and repairs that one of the Meyer's RV purportedly performed in response to the initial complaints that he made immediately after he took possession of the motor home, reflect that there had been "prior repairs" performed on the vehicle even before he had ever purchased it. A job order generated by Meyer's RV's service department and dated December 30, 2019 (two days after the sales transaction was completed and the vehicle delivered) refers to "prior unit repairs" and "water stains from previous repair," clearly indicating that there had been prior use of the motor home, that prior repairs had been made to it, and that it was not a new vehicle. Mr. Kotruch was completely unaware of these circumstances, and had no reason to be aware, at the time that he purchased it. Some of those pre-sale defect repairs were not fixed right because they arose again after Mr. Kotruch bought the RV If Mr. Kotruch had known the truth about this RV and its prior list of defects and repair attempts that the selling dealer knew, but did not disclose to him, he would not have bought the subject RV at all.

41.     At the time that Meyer's RV notified Mr. Kotruch to pick up the motor home after nearly three months of purported repair work, and also at the time that he collected it on or about March 17, 2020, Meyer's RV falsely represented to him that all of his concerns had been addressed and that all of the defective conditions of which he had complained had been repaired. Those representations were false. In reality, Meyer's RV had made only half-hearted attempts to repair the defects, or none at all, and Meyer's RV was well aware that it had not addressed all of his complaints or cured all of the defects. Shortly after retrieving the vehicle

13

from Meyer's RV, Mr. Kotruch discovered that few of the defects of which he had complained had been fully corrected, and none of the most serious ones; and moreover new problems began to surface.

42.   The Meyer's RV, acting through their local agents and representatives at Meyer's RV, made these misrepresentations for the purpose of attempting to avoid their obligations, to avoid doing further work on the subject motor home, and to avoid spending further time, money, and effort on repairs for which, being covered by the warranty, they knew that they and their company would not be paid. Meyer's RV and its representatives knew that Mr. Kotruch lived in New Hampshire and that once he drove the product home, he would not be able to bring it back for further warranty work except at great trouble, expense, and inconvenience. Meyer's RV's representatives made the aforementioned misrepresentations in order induce Mr. Kotruch to remove the product from the dealership premises and to, in effect, wash their hands of Mr. Kotruch and of the problems with the vehicle.

43.   Mr. Kotruch relied on these misrepresentations to his detriment in traveling from Dover, New Hampshire to Syracuse to collect the vehicle, in accepting it, and in driving it home. By the time that he discovered that Meyer's RV had failed to repair the most serious of the defects, it would have been highly awkward and unwieldy for him to seek further relief from the latter. Seeking such relief would require two more trips to and from Syracuse and could be accomplished only at extreme trouble, expense, and inconvenience, even though Meyer's RV would presumably have been required to perform the repairs themselves free of charge.

44.   Further, after retrieving the subject vehicle and driving it home, Mr. Kotruch discovered numerous other flaws, defects, and other non-conformities in the product, having varying degrees of severity but nonetheless rendering the product and/or its components and accessories unmerchantable.

45.     After these flaws, defects, etc., were brought to their attention, the Meyer's RV' representatives intentionally gave false explanations for same in order to avoid their responsibilities and to discourage Mr. Kotruch from seeking relief, deterring him through the imposition of delay, confusion, frustration, and inconvenience.  For example:

46.     After retrieving his new motor home from Meyer's RV on March 17, 2020, following nearly three months in its service facility, Mr. Kotruch discovered water leakage resulting in water dripping into the dining area of the residential quarters of the motor home when the slides were out.

47.     Upon having this condition brought to their attention, the personnel of Meyer's RV represented to Mr. Kotruch that this condition was "normal," explaining that "it is normal to have some water coming in during slide movement, especially when it is raining or snowing."

48.     These representations were false.  Water continued to drip into the residential quarters even at times when the motor home was stationary for sustained periods of time and thus when the slides were not being moved.  It was eventually determined that the leakage was due to damage to the roof rain gutter and to large gaps in the failed slide-out seals on the front and rear slide-outs on the passenger side. The condition had nothing to do with slide movement, despite Meyer's RV's representations to the contrary.

49.     After retrieving his new motor home from Meyer's RV following the nearly three months in its service facility, Mr. Kotruch discovered that the house battery disconnect switch did not connect to the house batteries, resulting in an inability to disconnect the house batteries from the vehicle.  (The "house batteries" refers to the batteries that supply electricity to the living quarters of the motor home, as opposed to the batteries that supply electricity to the motor of the vehicle.)

50.    Upon having this condition brought to their attention, the personnel of Meyer's RV represented to Mr. Kotruch that this condition was "normal," giving the cryptic and opaque explanation that the condition in question was "normal when shifting from vehicle power."

51.    This representation was false.  Through self-study and investigation, Mr. Kotruch eventually determined that the reason for the condition was a major electrical wiring fault.  This fact was confirmed by Thor itself in July 2020, and Thor eventually addressed the problem after Mr. Kotruch dropped off the vehicle to the latter for repairs in November 2020.

52.    After retrieving the motor home from Meyer's RV in March 2020, Mr. Kotruch discovered that the AquaHot heating system did not work properly.  Specifically, the heat to the residential quarters was constantly dropping off spontaneously.

53.    Upon having this condition brought to their attention, the personnel at Meyer's RV represented to Mr. Kotruch that this condition was a "normal" incident of switching electrical power sources, i.e., it was "normal when changing power sources, such as from an internal generator to external power."

54.    That representation was false.  Although Mr. Kotruch lacked sufficient expertise to understand or appreciate it at the time, the motor home had been operating on external electrical power the entire time that it had been in Meyer's RV's possession being repaired, including the time when that the problem was discovered.  There had been no switching.  Thus, the only correct explanation for the falling-off of the heat was a defect in the AquaHot heater, and the explanation given by the Meyer's RV' representatives was false.  The defective condition (viz., heater's failure to properly deliver heat) persisted for months and was eventually addressed by Thor in the fall of 2020, although Thor never succeeded in correcting it.  The condition persists even to this very day.

55.     Upon retrieving his new motor home from Meyer's RV following nearly three months in the repair shop, Mr. Kotruch discovered that the boarding steps, by which occupants board and disembark from the vehicle, would not fully retract.

56.     Upon having this condition brought to their attention, the personnel of Meyer's RV falsely represented to Mr. Kotruch that the problem was due to a "low voltage condition" which was fleeting in nature and which was attributable to the fact that electricity was being delivered by a local, low-voltage energy source. Meyer's RV's personnel represented to Mr. Kotruch that, once the vehicle was fully charged as a result of being driven for a few hours, the condition would rectify itself.

57.     These representations were false. Charging the vehicle by driving it for several hours had no effect on the problem. The defective condition persisted for months, despite ample driving, until it was finally corrected by Thor after the vehicle was delivered to the latter for repairs in November 2020.

58.     After retrieving the new motor home from Meyer's RV following nearly three months in the latter's service facility and after starting to drive it around and about, Mr. Kotruch discovered that the television cabinet in the bedroom popped open spontaneously each time that the vehicle was moved or driven.

59.     Upon having this condition brought to their attention, the personnel of Meyer's RV falsely represented to Mr. Kotruch that it was "normal" for doors and drawers "to shift during driving" and that this condition did not require correction.

60.     These representations were false. As Mr. Kotruch eventually learned, the television cabinet did not merely pop open sporadically or occasionally; rather, it popped open 100% of the time, each time that the motor home was moved or driven. Months later, it was determined by Thor that the reason for this condition was that the securing brackets which were supposed

to be used to latch the cabinet and keep it in place had never been installed by the factory during assembly of the motor home and its accessories.

61.    The new motor home was delivered to Mr. Kotruch without any of the hand-held remote control devices that were needed to operate the four television sets that were installed in the vehicle, which in turn were used to help navigate it.

62.    Upon having the absence of these devices brought to their attention, the Meyer's RV' representatives falsely represented to Mr. Kotruch that this was "normal," explaining that "during shipment or transportation things get stored all over the place" and that the missing remote control units would eventually turn up.

63.    These representations were false.  No remote control units were ever found, and in fact they had never been placed in the motor home.  The motor home was simply delivered without them.

64.    Mr. Kotruch similarly brought the absence of these devices to Thor's attention when the product was dropped off at its Indiana service and repair facility months later, but Thor was either unwilling or unable to supply them.  The only remote control units which Mr. Kotruch has ever had for the vehicle are units which he separately purchased himself upon default of the Defendants on their obligations.

65.    The Meyer's RV made these misrepresentations to Mr. Kotruch knowing that they were false at the time they were made, and the Defendants made said misrepresentations for the purposes of evasion and delay, in order to avoid having to perform their obligations or honor their warranties, to discourage Mr. Kotruch from obtaining relief, to deter him from vindicating his rights, and to avoid doing further work on the vehicle or spending further time, money, and effort on repairs.  In short, Meyer's RV was "stringing along" Mr. Kotruch with the hope and

18

expectation that they could wear down his resolve through the imposition of delay, expense, obfuscation, and inconvenience.

66.     Thor, too, misrepresented to Mr. Kotruch that it had addressed and resolved all of his complaints and corrected all of the defects in the motor home after that product had spent three months in Thor's service and repair facility, supposedly being serviced.  After collecting his motor home from Thor on February 9, 2021, it quickly became obvious to Mr. Kotruch that Thor had not corrected many of the defective conditions for which he had brought it there in the first place, including the most serious ones (namely, the leakage and the defective heating system).  Like Meyer's RV, Thor knew or should have known that its representations were false and that the defects still existed, but it made those false representations to him, anyway, in order to get rid of him and to wash its hands of him.

67.     Mr. Kotruch relied on these false representations to his detriment by (a) making two trips to and from Syracuse, New York and Elkhart, Indiana, respectively, from Dover, New Hampshire, at considerable expense and inconvenience in each instance, in order to drop off the subject motor home for service and repairs and to retrieve it after those repairs had supposedly been completed; (b) accepting delivery of the subject motor home following those repairs, in reliance on the Defendants' representations that the repairs had been successfully completed, instead of rejecting delivery, insisting that the conditions which the Defendants claimed were "normal" be corrected, and/or revoking his acceptance of the product at that time; (c) spending nearly $20,000 on annual vehicle taxes, insurance, and routine upkeep and maintenance, in anticipation of keeping and continuing to use and enjoy the subject vehicle, in circumstances in which he would otherwise have rejected the product and/or rescinded the transaction but for the Defendants' continuing promises to cure their breaches of warranty and their misrepresentations that they had actually done so; (d) continuing to pay monthly

motor vehicle loan payments to his financier in the amount of approximately $1,800 a month, in the vain and ultimately futile hope that the Defendants would honor their promises and obligations and that he would be able to use and enjoy his new motor home; and (e) refraining for the time being from taking legal action or from revoking his acceptance sooner.

68. As a result of the Defendants' misrepresentations, Mr. Kotruch has suffered the damages and losses referred to hereinbefore.

## COUNT 3: BREACH OF CONTRACT

69. The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

70. As part and parcel of the sales transaction, Mr. Kotruch purchased an extended warranty ("the Extended Service Contract") from United Service Protection Corp., for which Mr. Kotruch paid an additional $13,000 over and above the cost of the subject motor home.

71. Under the terms of the Extended Service Contract, Mr. Kotruch had the right to cancel it for any reason and to obtain a full refund of the $13,000 consideration that he had paid for it, provided that he did so by giving notice of cancellation within sixty days of the date of the transaction.

72. Mr. Kotruch subsequently did, in fact, cancel the Extended Service Contract by giving due and proper notice of cancellation well within the sixty-day period, giving such notice by registered mail on January 6, 2020.

73. United Service Protection Corp has failed and refused, and continues to fail and refuse, to remit to him the $13,000 that he paid for the Extended Service Contract, thereby breaching the terms of the Extended Service Contract.

## COUNT 4: NEW YORK CONSUMER PROTECTION LAWS

74.    The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

75.    This claim is for violation of New York General Business Law Art. 22-A, Consumer Protection from Deceptive Acts and Practices, NY CLS Gen Bus 349 -350 et seq, by Defendants Meyer's RV and the Meyer's RV and Thor.

76.    The New York General Business Law Art. 22-A, Consumer Protection from Deceptive Acts and Practices, NY CLS Gen Bus 349 -350 et seq, generally prohibits deception, deceptive acts and false advertising.

77.    Prior to, in relation to, and during one or more consumer transactions with Mr. Kotruch, the said Defendants each engaged in the practice of advertising its motor vehicles as consumer goods and related services that were available for purchase in New York and elsewhere and in the process of doing so, each of the said Defendants made and/or published and distributed advertising, including representations of quality and reliability of its goods and services that were deceptive and/or misleading in their material ways. Thor also made and/or published and distributed advertising representations of some warranty terms to any purchaser, including Mr. Kotruch, and describing coverage without describing the many conditions and exceptions actually contained within its written warranty and which are used to deceptively, unfairly, and unconscionably defeat warranty coverage and/or warranty remedies. Meyer's RV also used unconscionable terms and conditions in one or more of its agreement forms for the sale of consumer goods.

78.    After the said Defendants made their representations, Mr. Kotruch purchased the subject motor vehicle.

79.    Subsequently Mr. Kotruch discovered that the said Defendant representations and advertising about the goods and services in relation to and of the subject motor vehicle, which were

material to Mr. Kotruch's decision to purchase Defendant's goods and services, were misleading and/or deceptive and/or false and thereby violated New York General Business Law Art. 22-A, Consumer Protection from Deceptive Acts and Practices, NY CLS Gen Bus 349 -350 et seq in one or more manners. Said Defendants' deceptive and misleading representations were made by said Defendants with the intent to induce buyers of motor vehicles to purchase the said Defendant goods and services in New York and did, in fact, induce Mr. Kotruch to do so in New York. After purchasing the said Defendant goods and services, Mr. Kotruch discovered that Thor would not honor and comply with its obligations to Mr. Kotruch under the New York Motor Vehicle Lemon Law and/or its warranties and/or obligations, and although Thor had a legal obligations to Mr. Kotruch, Thor avoided and/or attempted to avoid one or more of its obligations and also refused to comply with what it knew or should have known were its obligations under both New York's Lemon Law and its own warranty. Thor knew, or should have known, that doing so would be deceptive and misleading and/or make its prior advertising false, but did it anyway.

80.    The advertising by said Defendants in New York was in furtherance of and part of their conduct of business in the furnishing of both goods and services in New York and elsewhere. Prior to and/or during and/or after Mr. Kotruch purchased the goods and services of the said Defendants, Defendants Thor and Meyers and the Meyer's RV distributed false advertising in relation to the goods and services they did and would provide to their customers, including Mr. Kotruch, in the conduct of their business activities in and affecting the retail sale of RVs in New York. The representations in advertising by said Defendants had a tendency to and/or did deceive or mislead the purchasing public, including Mr. Kotruch.

81.    Prior to and during a consumer transaction with Mr. Kotruch, the Defendant was engaged in the practice of advertising its motor vehicles as consumer goods and related services available

for purchase in New York and elsewhere and in the process of doing so, Defendant made and/or published and distributed advertising representations of the quality and reliability of its goods and services that were deceptive and/or misleading in their material ways. Defendant also made and/or published and distributed advertising representations of its warranty terms to any purchaser describing its coverage, while also creating a separate warranty document to serve as its warranty which had different terms of coverage and limitations not stated in its "5 star warranty." as a result one of Defendant's two warranties is deceptive and false, if not both being such.

82.    As a result of the above, among other things, one or more deceptive and/or misleading acts, omissions, or practices were committed by the said Defendants including but not limited to:

(1).    Representing that the subject of a consumer transaction has performance, characteristics, accessories, uses, or benefits it does not have, and/or which the supplier knows or should reasonably know it does not have;

(2).    Representing that the subject of a consumer transaction is of a particular standard or quality when it is not, and/or which the supplier knows or should reasonably know that it is not;

(3).    Representing that the transaction involves or does not involve a warranty and/or contract, a disclaimer of warranties, or other rights, remedies or obligations when the representation was false, and/or which the supplier knows or should reasonably know that the representation is false;

(4).    Failing to remedy warranty-covered defects in a warranted vehicle within a reasonable number of attempts;

(5).    Failing to remedy warranty-covered defects in a warranted vehicle within a reasonable amount of time;

(6).    Failing to honor a request to take the vehicle back and/or rescind and/or cancel the sales and warranty and/or contract transaction;

(7).    Failing to honor a request to take the vehicle back and rescind and/or cancel the sales and warranty and/or contract transaction within a reasonable amount of time;

(8).    Including one or more unconscionable and/or unreasonable and/or overreaching terms in written agreement(s), consumer transaction

document(s), and/or warranty document(s) and/or one or more terms and/or conditions not fully and conspicuously disclosed in simple and readily understood language;

(9). Stalling and/or delaying and/or refusing the performance of a legal obligation;

(10). Soliciting a person to enter into a contract or agreement that contains terms and/or conditions that are not fully and conspicuously disclosed in simple and readily understood language, and/or terms that are oppressively one sided or harsh and/or in which the terms unduly limit the person's remedies, and/or in which the price is unduly excessive, and/or there was unequal bargaining power that let the person to enter into the contract or agreement unwillingly or without knowledge of the terms of the contract(s) or agreement(s);

(11). Refusing and/or failing to recognize the rights of a buyer under the New York Motor Vehicle Lemon Law; and

(12). Refusing and/or failing to comply with one or more obligations under the New York Motor Vehicle Lemon Law.

83. As a result of the above, inter alia, the said Defendant committed one or more unfair or deceptive acts or practices in violation of the said New York Consumer Protection laws before, during, or after a consumer transaction between Plaintiffs and a supplier in relation to the subject motor vehicle involved in this case.

## COUNT 5: NEW YORK MOTOR VEHICLE LEMON LAW

84. The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

85. This claim is for violation of the New York Motor Vehicle Lemon Law, NY CLS Gen Bus § 198-a (hereafter, "the Lemon Law") by Thor.

86. The New York Lemon Law was enacted for the legislative purpose of providing protection to and for purchasers of motor vehicles that are sold by New York retail motor vehicle dealers. The state of New York has a primary interest in protecting consumer purchasers of motor vehicles in New York and regulating the retail motor vehicle sales industry in New York for the protection of retail purchasers of motor vehicles sold in New York.

87.     Mr. Kotruch performed all conditions precedent to private enforcement of the New York
        Motor Vehicle Lemon Law. The obligations of Thor under the New York Motor Vehicle
        Lemon Law was not complied with by Thor.

88.     Mr. Kotruch brings this action for monetary damages and/or equitable remedies because of
        serious and chronic defects that the subject motor vehicle has experienced and exhibits and
        which are subject to the New York Motor Vehicle Lemon Law.

89.     The vehicle involved in this case was purchased in New York and is a type vehicle that is
        covered by the New York Motor Vehicle Lemon law and because of its defect and repair
        history the vehicle qualifies as a "lemon," both generically and under the New York Motor
        Vehicle Lemon Law. Thor qualifies as a motor vehicle "manufacturer" under the New York
        Motor Vehicle Lemon Law.

90.     As a result of the allegations above and below, among other things, Defendant Thor failed to
        comply with its obligations and requirements under the New York Motor Vehicle Lemon Law
        to the injury of Mr. Kotruch.

91.     At all times relevant hereto and all within the meaning of New York Motor Vehicle Lemon
        Law, Mr. Kotruch was a consumer in that Mr. Kotruch is a purchaser, other than for purposes
        of resale, of a motor vehicle which was used primarily for personal, family or household
        purposes and/or are each a person entitled to enforce the obligations of the manufacturer's
        warranty.

92.     At all times relevant hereto, the subject motor vehicle in this case was a motor vehicle within
        the meaning of New York Motor Vehicle Lemon Law in that it was not an off-road vehicle
        and it was a motor vehicle that was subject to a manufacturer's express warranty at the time
        of original delivery to Mr. Kotruch and was purchased and transferred in New York within

the first 18,000 miles of operation and within two years from the date of original delivery to Mr. Kotruch.

93.    At all times relevant hereto, Thor was a corporation and a supplier and merchant and the manufacturer of the motor vehicle which is the subject of this case and Thor conducted substantial business in New York.

94.    The parties entered into a consumer transaction within the meaning of the New York Motor Vehicle Lemon Law and New York CLS General Business Law Art. 22-A, Consumer Protection fro Deceptive Acts and Practices, including sections 349 and 350, involving a certain 2019 Thor Tuscany 45MX, which Defendant's authorized retail seller, Meyer's RV RV Sales Syracuse, sold to Mr. Kotruch in New York under the terms of a written agreement and recreation finance promissory note and security agreement, and as part of the deal the Thor was obligated to comply with its requirements under the New York Motor Vehicle Lemon Law, among other laws, and Thor also agreed to warrant the vehicle and Freightliner Customer Chassis Corporation agreed to warrant the chassis which includes the engine and component parts which power the vehicle.

95.    A copy of the purchase agreement is not attached for the reason that it contains personally identifying information, it is available to the Defendant, Mr. Kotruch will provide a copy upon request, and it will be introduced into evidence at the trial hereof, as are and will be all other documentary proof of the allegations in this Complaint.

96.    Mr. Kotruch acquired the vehicle in reliance on the vehicle being subject to the New York Motor Vehicle Lemon Law and on the existence of a written warranty from Thor and Freightliner and on advertising representations and/or express and/or implied warranties from Thor to Mr. Kotruch, and on reliance that Defendants Thor and Freightliner would comply with any and all lawful obligations to each of them under New York laws because the

sale of the Thor's motor vehicle to him by Thor's authorized retail seller occurred in New York.

97.   A copy of the Thor's written warranty and Freightliner's written warranty is not attached for the reason that they are available to the Defendants, Mr. Kotruch will provide a copy upon request, and they will be introduced into evidence at the trial hereof as are and will be all other documentary proof of the parties of the allegations in this Complaint.

98.   The subject motor vehicle chassis and its engine was inherently defective in materials, design, and/or workmanship attributable to the Freightliner and/or Thor and the Lemon Law-covered defects appeared and arose during the term of Defendants' respective warranties beginning shortly after Mr. Kotruch took delivery of the subject RV, and Defendants Freightliner and Thor and their authorized representatives and agents and repair facilities were unable to correct the defects within the first two years of ownership and within the first 18,000 miles of use and after multiple repair attempt opportunities.  Specifically, the subject vehicle was presented to Freightliner dealers for warranty repairs covered by Freightliner on April 20, 2020 and was in the repair shop for 8 days, again on May 4, 2020 and was in the repair shop for 11 days, and again on June 9, 2020 and was in the repair shop for 37 more days, making a total of 56 days out of service because of the repair attempts on defects covered by the Freightliner warranty. The defects in and relating to the chassis included the "smart wheel" control system, leaking coolant lines, the alternator, and the dash air conditioning system. These defects, combined with the other defects in the RV rendered it out of service for 19 of the first 30 weeks after Mr. Kotruck bought the vehicle. If Mr. Kotruch had known the truth about the defective nature of the vehicle and its chassis he would not have bought the subject motor home.

99.    Through its advertising and otherwise, Defendant represented that the motor vehicle chasses it built and/or distributed and/or warranted were fit for the purpose for which they were designed and/or distributed, that they were safe and suitable vehicles for their intended designed use, reliably operable for private transportation and use and Mr. Kotruch acquired the vehicle in reliance upon the belief that Defendant possessed a high degree of manufacturing skill and judgment.

100.    Through its advertising and otherwise, Defendant represented that the motor vehicle chasses which it manufactured and/or distributed and warranted were of merchantable quality, fit and in proper condition for the ordinary use for which such vehicles are designed and used, and Mr. Kotruch relied on such, but the vehicle and/or its chassis involved in this case was not, however, of merchantable quality.

101.    The malfunctions and defects in the subject motor vehicle and/or its chassis severely and substantially impaired its use and/or safety and/or value to Mr. Kotruch.

102.    Mr. Kotruch provided each and every Defendant and/or one or more of their respective authorized dealers, representatives, repair facilities, and/or agents with a reasonable number of opportunities to repair the defects in the motor vehicle but the subject motor vehicle was unable to be properly repaired in the timely fashion required by the New York Motor Vehicle Lemon Law and Defendant failed to comply with its New York Motor Vehicle Lemon Law obligations within a reasonable amount of time or within a reasonable number of attempts.

103.    The failure to timely fix all of the vehicle's defects has caused Mr. Kotruch to lose confidence in the reliability of the subject motor vehicle and in the ability of the Manufacturer and Freightliner to properly repair the vehicle's defects and comply with its obligations under the New York Motor Vehicle Lemon Law, and that was unfair to Mr. Kotruch.

28

104.    Mr. Kotruch had numerous written and oral conversations with each Defendant and their respective employees where Mr. Kotruch complained to them about the multiple defects, the failed repair attempts by Defendant and/or its authorized dealers, representatives, repair facilities, and/or agents, and also other defects not covered by the New York Motor Vehicle Lemon Law.

105.    Mr. Kotruch asked Thor to take the vehicle back and refund his money but Thor has not or will not do so.  At the time Mr. Kotruch requested Thor to take the vehicle back, it knew or should have known that it had failed to comply with its obligations under the New York Motor Vehicle Lemon Law.

106.    As a result of the above facts, Thor and/or Freightliner violated the New York Motor Vehicle Lemon Law to Mr. Kotruch's injury.

107.    One or more of the defects and malfunctions in the motor vehicle were covered under the terms of the New York Motor Vehicle Lemon Law and the Freightliner's warranty, and Freightliner failed to repair the Lemon Law-covered defects in the motor vehicle, thereby diminishing the use and/or safety and/or value of the motor vehicle.

108.    The purpose of the New York Motor Vehicle Lemon Law and of Defendant's warranty was (a) to get the motor vehicle fixed within a reasonable amount of time and within a reasonable number of attempts if a Lemon Law-covered defect arose, and the effect of the Lemon Law was (a) to give Mr. Kotruch confidence in the reliability and quality of the motor vehicle, and (b) to give Mr. Kotruch confidence in the Defendants Thor and Freightliner representations about the quality and reliability of the subject motor vehicle and the motor vehicles and chasses that Defendants Thor and Freightliner each designed and built, and (c) to give Mr. Kotruch confidence in Defendants themselves as responsible companies that would live up to their

29

representations, promises, word, warranties, and most importantly their legal obligations to Mr. Kotruch under the New York Motor Vehicle Lemon Law.

109.   Defendants Thor and/or Freightliner and/or one or more of its authorized dealers, representatives, repair facilities, and/or agents each had notices of their respective failures to comply with the New York Motor Vehicle Lemon Law and the defective condition of the subject motor vehicle within a reasonable time.

110.   The subject motor vehicle has been in for defect repair attempts and service attempts multiple times for a laundry list of defects, problems and malfunctions far exceeding what a reasonable person would expect if the subject motor vehicle had been manufactured right in the first place or repaired right by Defendant and/or its representatives and/or agents. The subject motor vehicle has been out of service by reason of repairs and/or repair attempts to the motor vehicle for an unreasonable number of days and a time exceeding what a reasonable person would reasonably expect for the quality of which Defendants Thor and Freightliner represented this consumer product would be. The repair and service work attempts was performed under a written warranties from Freightliner and in Freightliner's failed attempts to fulfill its obligations to Mr. Kotruch under New York law at various times and dates since purchase but those attempts failed.

111.   There were defects in the subject motor vehicle which were covered by the New York Motor Vehicle Lemon Law that were substantial and existed in the subject motor vehicle when it was sold to Mr. Kotruch and when Mr. Kotruch attempted to operate and use the subject motor vehicle and which Mr. Kotruch complained about to Thor and Freightliner within the first two years and within the first 18,000 miles after retail delivery of the subject vehicle to Mr. Kotruch.

112. There were also defects which existed in the non-Lemon Law portion of the subject recreational vehicle which were substantial and existed in the materials and workmanship attributable to one or more Defendants and they are listed herein because they are an indication of the overall lack of quality and reliability in the subject recreational motor vehicle which is attributable to the manufacturer and the inability of the Freightliner and/or Thor and/or its agents to make effective repairs on the portion of the subject motor vehicle which is covered by the New York Lemon Law.

113. Mr. Kotruch have been unable to use the motor vehicle in the expected, normal and customary manner because of the substantial defects and problems and malfunctions experienced with the subject motor vehicle, including the chassis and chassis-related defects, and which were covered by the Lemon Law, which caused Mr. Kotruch's loss of confidence in the quality and reliability of the subject motor vehicle and loss of confidence in the ability of Defendants Thor and Freightliner  to live up to their respective legal obligations to Mr. Kotruch under the New York Motor Vehicle Lemon Law.

114. Prior to filing this case Defendants Thor and Freightliner were notified of Lemon Law-covered defects and non-conformities in the motor vehicle and their respective authorized agent and repair facility's failed repair attempts, repeatedly prior to filing this case.

115. In all respects, Mr. Kotruch completely and/or substantially performed his obligations under the Lemon Law and under Defendants Thor's and Freightliner's written warranties to him, and Defendants Thor and Freightliner did not perform their obligations under the Lemon Law, as set forth herein above and below.

116. Because of the failures of Defendants Thor and Freightliner and their agents to comply with the Lemon Law, Mr. Kotruch notified Defendants Thor and Freightliner and/or one of their respective authorized servicing dealers and agents of the numerous defects and on various

dates delivered the motor vehicle into the possession of Defendants Thor and Freightliner and/or one of their authorized servicing dealers and agents at his cost and/or expense beginning shortly after the sale.

117.    In spite of Thor's and Freightliner's obligations, when Mr. Kotruch complained of the inability of Thor and Freightliner and their authorized repair facilities and agents to repair the vehicle, Defendants Thor and Freightliner and their authorized repair facilities and agents did not repair or replace or repurchase the subject vehicle.

118.    Prior to filing this case, Mr. Kotruch provided notice to each Defendant about its respective abusive and/or unfair and/or deceptive and/or unconscionable acts, practices and failures to live up to its warranty and/or contract and/or agreement and/or representations.

119.    Instead of performing as represented, Thor and/or Freightliner did not repair all defects in the vehicle once and for all time and because of the excessive days out of service due to warranty covered repair attempts on defects covered by the New York Motor Vehicle Lemon Law, Thor and/or Freightliner each thereby violated their legal obligations to Mr. Kotruch under the New York Motor Vehicle Lemon Law and thereby committed one or more abusive and/or unfair and/or deceptive and/or unconscionable acts and/or practices.

120.    As a result of the above, inter alia, the Thor and/or Freightliner is in violation of their obligations to Mr. Kotruch under the New York Motor Vehicle Lemon Law.

121.    Mr. Kotruch suffered and shall continue to suffer actual, incidental and consequential damages as a direct and proximate result of the inability or other failure of Thor's and Freightliner's authorized representatives and agents to comply with the New York Motor Vehicle Lemon Law.

**COUNT 6: REVOCATION OF ACCEPTANCE**

122.   The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

123.   When Mr. Kotruch purchased the subject RV from the Defendant, Mr. Kotruch had no knowledge of the quantity or seriousness of the defects in the RV, its non-conformities, damage, malfunctions and problems of subject RV, and could not reasonably have discovered them. Mr. Kotruch' purchase of and acceptance of the subject RV was reasonably induced by the difficulty of discovery of the defects, non-conformities, damage, malfunctions and problems of the subject RV before acceptance. These defects, non-conformities, damage, malfunctions and problems have substantially impaired the use and/or safety and/or value of the subject RV. The multitude of past and ongoing defects, non-conformities, damage, malfunctions and problems with subject RV have not been seasonably or timely cured by Defendant.

124.   Mr. Kotruch is entitled to, and do hereby, revoke their acceptance of the subject RV. Mr. Kotruch revocation of acceptance has occurred within a reasonable time after Mr. Kotruch discovered or should have discovered the grounds for it and before any substantial change in condition of the subject RV which is not caused by or resulting from the subject RV's own defects. Mr. Kotruch is entitled to the rights of a purchaser who has properly rejected the goods, including recovery of the purchase price and all expenses reasonably incurred in the inspection, receipt, transportation, repair, care and custody of the subject RV together with incidental and consequential damages for expenses Mr. Kotruch reasonably incurred incident to their ownership of the subject RV.

125.   Mr. Kotruch gave multiple written notices of his revocation of acceptance to and demanded that Meyer's RV and/or the Meyer's RV and/or Thor take the vehicle back and cancel the transaction and refund his monies but they did not and/or would not agree to do so.

## CLAIM 7: MAGNUSON-MOSS WARRANTY ACT

126.    The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

127.    This claim is for breach of express and/or implied warranties and/or contract of warranties and/or the violation of their obligations under the Magnuson-Moss Warranty Act, 15 U.S.C. 2301, et seq, by Thor and/or Meyer's RV and/or the Meyer's RV, and/or Freightliner, including but not limited to their obligations to comply with their warranties and/or contract and/or contract of warranty and/or to make their respective warranty term disclosures and each of their actions in full compliance with all provisions of the Magnuson-Moss Warranty Act and its applicable regulations.

128.    As a result of the above, among other things, each said Defendant has breached its obligations under the Magnuson-Moss Warranty Act and/or its applicable disclosure and/or other regulations.

129.    As a result of the above, among other things, each Defendant breached its obligations to make its warranty term disclosures and its actions in full compliance with all provisions of the Warranty Act and the applicable Code of Federal Regulations.

130.    As a result of the above, inter alia, each Defendant is in violation of the Magnuson-Moss Warranty Act.

WHEREFORE, Plaintiff John Kotruch hereby demands that judgment be entered in his favor and against the Defendants, jointly and/or severally, on each individual claim, for actual and/or statutory and/or other damages, remedies, and relief as deemed proper and lawful by the Court for each and every violation that may be proven at trial and for reasonable attorney fees, interest, and expenses and costs of litigation, and any and all other legal and equitable relief deemed necessary and just.

Plaintiff demands trial by jury on all claims and issues.

Respectfully submitted,

*/s/ Elizabeth Ahern Wells*

ELIZABETH AHERN WELLS
BURDGE LAW OFFICE, CO., LPA
8250 Washington Village Drive
Dayton, Ohio 45458-1850
Telephone:      937.432.9500
Fax:            937.432.9503
Email:          Beth@Burdgelaw.com

Attorneys for Plaintiff John Kotruch